UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                    :
STEVEN DRESNER and ROBERT STARK,                    :        01 Civ. 7221 (SHS)
                                                    :
                          Plaintiffs,               :        <u>OPINION & ORDER</u>
                                                    :
              -against-                              :
                                                    :
UTILITY.COM, INC., CLEARSTONE VENTURE               :
PARTNERS, WILLIAM T. GROSS, PRIMEDIA                :
VENTURES, INC. HOWARD MORGAN, CHRIS KING,           :
PAUL FALCHI, MICHAEL ANDERSON, TIMOTHY              :
MORRIS, ELLA CONRAD, JOEL HAYATT, LARRY             :
PHILLPS and TODD SPRINGER,                          :
                                                    :
                          Defendants.               :
------------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        This suit arises from a dot com deal turned sour.  Plaintiffs sold their communications software

company – VCOM.COM – to an internet utility provider – Utility.com – and received most of the

consideration for their VCOM.COM shares in the form of Utility.com shares.  Within seven months of

acquiring VCOM.COM, Utility.com was liquidated, rendering its stock essentially worthless.

Plaintiffs claim they were fraudulently lured into the transaction and seek damages for alleged

violations of Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 77o, of the Securities

Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under Section 10(b).

Plaintiffs also assert state law claims for fraud, fraudulent inducement, and negligent

misrepresentation.  Defendants now move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6)

for failure to state a claim and failure to plead fraud with sufficient particularity, as Fed. R. Civ. P. 9(b)

and the Private Securities Litigation Reform Act of 1995 (“PSLRA”), Pub. L. No. 104-67, 109 Stat.

737 (codified in pertinent part at 15 U.S.C. § 78u-4), require.  Because plaintiffs have failed to plead

their securities fraud claims with the requisite particularity, defendants' motions to dismiss the complaint are granted.

I. BACKGROUND

The relevant facts set forth in the First Amended Complaint ("FAC") are recounted below.

A. The Parties

1. Plaintiffs

Before the transaction at issue in this action, plaintiffs Steven Dresner and Robert Stark were the principle shareholders of VCOM.COM ("VCOM"), a telecommunications software company that was unprofitable, but "actively engaged in obtaining additional financing for its operations." (FAC ¶¶ 1-2, 21, 22). Both plaintiffs have studied business, and have an extensive practical business background. (See Information Statement dated August 3, 2000 ("IS") at 22). During the process of negotiating and effectuating the merger at issue in this litigation, the law firm Paul, Hastings, Janofsky and Walker represented plaintiffs. (FAC ¶ 33; IS at 52).

2. Utility.com

Utility.com sold utility services, such as electricity, via the Internet. (FAC ¶ 23). Prior to acquiring VCOM, Utility.com posted substantial losses, but had secured over $30 million in private equity investment. (Id. ¶ 25). At the time of the merger, Utility.com anticipated obtaining another $22 million in what it dubbed its "Series E financing," which closed in November of 2000, within a few months of the August 25 closing of the VCOM acquisition. (Id. ¶¶ 2, 25). In March of 2001, within five months of the completion of the Series E financing and seven months of the closing of the VCOM acquisition, Utility.com was being liquidated. (Id. ¶¶ 71-74).[1]

3. idealab! Defendants

---

[1] Although Utility.com is named as a defendant, the record contains no evidence of service of process upon it; indeed, Utility.com is alleged to have been liquidated (FAC ¶¶ 71-74).

Defendant William Gross was the co-founder of Utility.com and served as chairman of the company.  (Id. ¶¶ 6, 17).  Defendant Gross also co-founded idealab!, an incubator for internet start-up companies.  (Id. ¶¶ 6, 18).  Allegedly, Gross controlled idealab! and idealab! controlled Utility.com. (Id. ¶ 17(a)).

Defendant Clearstone Venture Partners, formerly known as idealab! Capital Partners, is the venture capital arm of idealab!.  (Id. ¶ 17(b)).  Gross co-founded Clearstone and allegedly controlled it at the time of the merger at issue in this litigation.  (Id.). Gross and Clearstone Venture Partners are referred to as the "idealab! Defendants."

### 4. Primedia Defendants

Defendant Primedia Ventures Inc. ("Primedia") is the venture capital affiliate of Primedia, Inc., a media company that owns and operates websites.  (Id. ¶ 18).  Primedia owned approximately 5% of Utility.com.  (Id.).  Defendant Larry Phillips was a managing director of Primedia before the merger. (Id.).  In his capacity as a member of Utility.com's Board of Directors, Phillips – on behalf of Primedia – allegedly exercised significant control over Utility.com.

### 5. Individual Defendants

Among the defendants are three former officers of Utility.com who are referred to collectively as the "Insider Defendants."  They are Chris King, Co-Founder, Chief Executive Officer, and a director of Utility.com; Paul Falchi, President and Chief Operating Officer of Utility.com; and Timothy Morris, Chief Financial Officer of Utility.com.[2]  All defendants other than the Insider Defendants are collectively referred to as the "Non Insider Defendants."

Plaintiffs have also brought their claims against several directors of Utility.com who are not alleged to have been corporate officers.  These defendants are Howard Morgan, Chairman of the Board

---

[2] In addition, plaintiffs list Michael Andersen, Chief Technology Officer of Utility.com, as a defendant. The record contains no indication that Anderson has been served, and he has neither moved nor answered.

of Directors of Utility.com and Vice Chairman of idealab!; Joel Hayatt, a director of Utility.com and

Managing Director of idealab's Silicon Valley office; Larry Phillips, a director of Utility.com and a

Managing Director of Primedia; and Todd Springer, a director of Utility.com and Managing Director

of Trident Capital Partners, a venture capital firm that owned 11.4% of Utility.com stock.[3] (Id. ¶¶

19(a)-(i)).  These defendants and the "Insider Defendants" are collectively referred to as the

"Individual Defendants."

      The idealab! defendants, Primedia and the Individual Defendants (collectively, "the Moving

Defendants") have all moved to dismiss the complaint for failure to state a claim and for failure to

comply with the pleading particularity requirements of Fed. R. Civ. P 9(b) and the PSLRA, 15 U.S.C.

§ 78u-4.

B. The Alleged Misrepresentations and Omissions

      Plaintiffs allege that in early 2000, Gross and the other venture capitalists who had provided

funding to Utility.com "were anxious to cash out" through an initial public offering ("IPO").  (Id. ¶ 4).

To do that successfully, they had to create the appearance that Utility.com was expanding and

diversifying into new markets, such as telecommunications.  (Id.).  Around that time, plaintiffs were

negotiating for Series E financing to sustain their money-losing operations until the contemplated IPO.

(Id. ¶ 6).  Plaintiffs made representations to potential Series E investors regarding VCOM.  (Id.).  In

furtherance of the objectives of securing the Series E financing and "cashing out" at the IPO,

defendants began negotiating with plaintiffs in February of 2000. (Id. ¶¶ 6-7).  In April, the parties

signed a mutual non-disclosure agreement.  (Id. ¶ 31).  In April, May and June, plaintiffs engaged in

discussions and had a series of meetings with various defendants.  (Id. ¶¶ 31-42).  On May 30, 2000

---

[3] Plaintiffs also list Ella Conrad who had served in several capacities as an employee of Utility.com, including ultimately as
the Chief Information Officer.  (FAC ¶ 19(f)).  She was dismissed from this action, however, by order of Judge Allen G.
Schwartz – the Judge formerly presiding over this litigation – on March 15, 2002.

after extensive negotiations, the parties executed a term sheet and began due diligence.  (Id. ¶ 36).  On June 30, the parties signed their Agreement and Plan of Reorganization ("Merger Agreement" or "MA").  The transaction closed on August 25, 2000, when Utility.com acquired VCOM for 2,362,794 shares of Utility.com common stock, as well as $500,000 in cash.  (Id. ¶ 2).  Plaintiffs claim that a series of misrepresentations made by defendants in the Merger Agreement, as well as in statements made before and after the Merger Agreement was signed, rise to the level of fraud under the securities laws.

### 1. Pre-Merger Agreement

Plaintiffs have set forth the following specific incidents in which fraudulent misrepresentations were allegedly made to plaintiffs in advance of the Merger Agreement:

- On April 13, 2000, in Emeryville, CA, plaintiffs met with Falchi, King, Morris and Andersen, who allegedly "made numerous positive representations regarding the financial condition of Utility.com, the strength of its operations and organization, its ability to integrate VCOM and the early success the Company was having with UtilityOne[, Utility.com's software platform]." (Id. ¶ 32).

- On April 17, 2000, plaintiffs met with Morris and Phillips at the New York City offices of plaintiffs' counsel, Paul Hastings.  At that meeting Morris and Phillips allegedly made representations about the positive financial condition of Utility.com and its ability to integrate VCOM into Utility.com.  Phillips also allegedly represented that his business relationship with Primedia and idealab! would benefit the combined company, and that he was interested in investing in VCOM. (Id. ¶ 33).

- On May 16, 2000, plaintiffs met with Chris King in Newark, New Jersey.  Plaintiffs claim that King made "numerous positive statements regarding Utility.com's technology, financial condition and operations and the experience of Utility.com's management."  (Id. ¶ 34).

- On May 23, 2000, in New York City, plaintiffs met with Tim Morris "to discuss the organizational structure of the combined company, compensation for VCOM management, Utility.com's financial stability and its fund raising efforts."  (Id. ¶ 35).

- During the week of June 5, 2000, plaintiffs met several times with Andersen Consulting representatives in the Utility.com offices in Emeryville, CA. The consultants "repeatedly assured plaintiffs that UtilityOne was operating effectively and could continue to serve Utility.com's customers."  (Id. ¶ 37).

Plaintiffs claim that each of these representations was made with the purpose of inducing plaintiffs to sell their VCOM stock, and that each was materially false and misleading.  Specifically, plaintiffs contend that defendants obscured the following adverse facts about Utility.com.  First, Utility.com allegedly suffered from significant business problems, including an absence of capable managers, an unsuccessful business plan and the need to spend excessively to attract new clients.  (Id ¶ 10).  Second, UtilityOne, Utility.com's "core technology and platform for conducting its business" allegedly did not function adequately and suffered from bugs and glitches.  (Id.).  According to plaintiffs, the system could not bill customers properly and caused "persistent customer service problems."  (Id.).  Third, as a result of its ineffective billing, Utility.com allegedly had uncollectible accounts of more than $1 million.  (Id.).  Fourth, Utility.com allegedly had an undisclosed liability stemming from its pledge to provide discounted power to residents of the state of Pennsylvania for twelve months.  (Id.)  Fifth, Utility.com allegedly intended to shut down VCOM's New York offices after the merger.  (Id.).

2. The Merger Agreement and the Information Statement

On June 30, 2000 the parties signed the Merger Agreement, which, according to plaintiffs, contained numerous false and misleading statements. (Id. ¶ 38).  The agreement provided that Utility.com had no undisclosed liabilities and that subsequent to its then-existing balance sheet, there had been no changes expected to have an adverse effect on the company, no undisclosed capital expenditure exceeding $10,000 and no revaluation of any of the company's assets.  (Id. ¶ 44(a)).

The Merger Agreement included a clause stating that other documents provided to the plaintiffs in connection with the Merger Agreement, which included the Information Statement, did not contain any untrue statements.  (Id. ¶ 46).  Plaintiffs maintain that this statement was misleading, because the Information Statement did contain misrepresentations and omissions.  (Id.).  Specifically, the Information Statement characterized Utility.com's business in positive terms, expressed the company's intentions to expand in the future, extolled the company's "superior customer service" and referred to the company's list of financial sponsors.  (Id. ¶¶ 47-53).  The Information Statement praised UtilityOne, commenting that the software delivered "superior e-commerce functionality" and that it "is scalable to 25 million customers."  (Id. ¶¶ 55-57).  The Information Statement also contained financial statements that PriceWaterhouseCoopers ("PWC") prepared, which plaintiffs allege, violated Generally Accepted Accounting Principles ("GAAP") by failing to disclose contingent liabilities stemming from Utility.com's commitment to provide discounted electricity to Pennsylvania residents and Utility.com's inability to collect accounts receivable.  (Id. ¶¶ 60-64).  In addition, the Information Statement allegedly failed to disclose plans to close the New York office of VCOM when discussing the integration of the companies.  (Id. ¶ 59).

Plaintiffs urge that the multitude of warnings contained in the risk disclosures of the Information Statement violated securities laws by representing as contingent eventualities certain events that had already transpired.  The warnings included that if customers did not accept the

Utility.com business model, "Utility.com's business results of operations and financial condition will be materially and adversely affected." (Id. ¶ 65). Utility.com cautioned that it believed the success of the business depended on its ability to develop technology and that if it failed to do so, the business would be harmed. (Id.). Specifically, Utility.com stated that "[a]lthough Utility.com has not suffered significant harm from any errors or defects [in its software] to date, Utility.com may discover significant errors or defects in the future that it may or may not be able to correct." (Id.). Utility.com also conveyed that it could not guarantee its ability to meet financial projections in the Information Statement. (Id.). According to plaintiffs, these cautionary statements were false, because they warned of problems that had already materialized. (Id. ¶ 65(a)).

Plaintiffs claim that the statements in the Merger Agreement and Information Statement (the "Merger Documents") were misleading, because they failed to disclose the following alleged facts: the true state of the business, including poor management, an inability to implement the business plan and excessive outlays to obtain clients; the expenditure of over $4 million to Imagitas for advertising; software and customer service problems stemming from glitches in UtilityOne software; an intention to close VCOM's New York office; a contingent liability in connection with a pledge to the State of Pennsylvania to provide discounted power to its residents; and the existence of substantial uncollectible accounts. (Id. ¶ 45). Each of these categories is discussed individually below.

a. Financial Condition

Plaintiffs claim that at the time of the Merger Documents, defendants already knew that Utility.com could not provide services to its customers in a cost-effective manner, that its business model was failing, that it lacked a sufficiently skillful managerial team to implement its business plan and that it had no possibility of meeting its financial projections. (Id. ¶¶ 45 (d), 65(b), (c), (h), 54(d), (g)). Plaintiffs allege that although the Information Statement contained risk disclosures addressing

each of these financial difficulties as potential challenges, it should have disclosed them as existing problems.  (Id. ¶¶ 65-66).

### b. Imagitas Expenditure

The Merger Documents allegedly omitted "numerous capital expenditures that exceeded $10,000 including but not limited to a $4,075,000 payment to Imagitas for advertisements in National Mover's Guide[.]"  (Id. ¶ 45(g)).

### c. Alleged Software and Customer Service Problems

Plaintiffs allege that the Merger Documents failed to convey the problems Utility.com had been experiencing with UtilityOne, the software "[a]t the center of Utility.com's business."  (Id. ¶¶ 26, 45(a), 54(a), 55-58).  Although Utility.com represented that the software was effective, functional and "scalable to 25 million customers," it was, in actuality, according to plaintiffs, "an unmitigated disaster."  (Id.).  UtilityOne depended on its billing engine, 2.0 Billing Engine, which was allegedly "inoperable at all times it was in use."  (Id. ¶ 27).  On November 3, 1999, approximately eight months before the merger, Michael Anderson allegedly received a memorandum informing him that the 2.0 Billing Engine was inoperable.  (Id.).  Moreover, plaintiffs allege that a former Utility.com employee who left the company in January of 2000, reported that the 2.0 Billing Engine was not functional as of January of 2000, and that as a result the company was unable to process customers in a particular market, San Diego California.  (Id.).

At some point "[s]hortly after January 2000," Utility.com attempted to improve UtilityOne by switching to a new billing engine using software from providers including Portal and Vitria ("the Portal billing engine").  (Id. ¶ 28).  Plaintiffs allege a series of problems with the Portal billing engine:

> The billing problems created by Portal were as follows: (i) bills were not being sent to customers.  According to a former employee of the Company, who was employed at the Company since its inception, several Utility.com executives, including Chris King and Tim Morris were customers of Utility.com but were not receiving bills; (ii)

the billing engine was not able to do "time of use" billing; (iii) the billing engine could not handle "balanced billing" – where a customer pays a budgeted amount and then at the end of the term there is a "true-up" where budget payments are compared to actual usage and the difference is either paid by the customer or refunded to the customer; (iv) the billing engine could not produce an accurate bill; and (v) UtilityOne did not have the ability to service commercial customers.

(Id. ¶ 29). Although plaintiffs claim that a former employee stated broadly that "the UtilityOne platform 'never worked[ ]'" (Id. ¶ 28), they do not designate any time frame for the alleged problems with the Portal billing engine.

Plaintiffs maintain that at some point billing glitches in UtilityOne led to customer service problems. (Id. ¶¶ 45(b), 54(b)). Specifically, thousands of customers were allegedly emailing complaints that did not receive responses for months. (Id. ¶ 30). Plaintiffs specify neither when these problems occurred nor whether they were caused by the 2.0 Billing Engine or the Portal billing engine. They do acknowledge, however, that at some point after these problems arose, "the Company had all employees help respond to the emails to eliminate the backlog." (Id.).

### d. Closing the VCOM Office

The Merger Documents discussed the substantial efforts that would be required to integrate Utility.com and VCOM successfully. It noted potential problems that might arise due to the geographic separation of the entities and the possibility that certain employees might have to be terminated following the merger. (Id. ¶ 59). Plaintiffs claim that these disclosures misstated Utility.com's intentions, because the company had already made plans to close VCOM's New York offices and move the combined entity's operations to the west coast. (Id. ¶¶ 45(f), 54(f)).

### e. Pennsylvania Liability

Plaintiffs claim that the Merger Documents fraudulently omitted the existence of a contingent liability resulting from Utility.com's pledge to the State of Pennsylvania that it would provide discounted power for a period of twelve months to residents of that state. (Id. ¶¶ 45(e), 54(e)).

Plaintiffs urge that the financial statements in the Information Statement, which were prepared by PriceWaterhouseCoopers, should have reflected that contingent liability in order to comply with GAAP. (Id. ¶ 61-63).

### f. Uncollectible Accounts

The Merger Documents allegedly failed to disclose that Utility.com faced substantial uncollectible receivables. (Id. ¶¶ 45(c); 54(c), 66). At one point in the First Amended Complaint, plaintiffs allege that the amount of the uncollectible receivables was $1 million. (Id.). At another point, plaintiffs allege that "according to a former employee of the Company, who was employed in various positions at the Company (leaving the Company in January 2001), including technical project manager, there was a huge percentage of uncollectible accounts, approximately $2 million, and the Company could not get a handle on the extent of the problem." (Id. ¶ 30). Plaintiffs contend that the PWC financial statements should have reflected the amount of uncollectible accounts receivable in order to comport with GAAP. (Id. ¶¶ 61-63).

### 3. Due Diligence

Plaintiffs allege that Utility.com made misrepresentations during the period of due diligence. These alleged misstatements and omissions were contained in a business plan, financial projections and two press releases that Utility.com provided plaintiffs.

Plaintiffs claim that a business plan dated October 1999 that Utility.com provided during due diligence was misleading because it set forth an aggressive company growth strategy, which it would effectuate through leveraging the brand name and idealab! connections to reduce marketing costs, capitalizing on the company's expertise with regulatory matters, utilizing superior web-based tools to collect data on customers and taking advantage of cost savings inherent in the internet-only business model. (Id. ¶¶ 39(a), (b)). Utility.com expressed an intention to pursue a marketing plan that was

"designed to acquire profitable customers rapidly at the lowest possible acquisition cost and in a manner consistent with building a durable national energy-Internet-utility brand." (Id. ¶ 39 (c)).

Plaintiffs allege that at some point during due diligence, defendants provided plaintiffs financial projections that noted expected revenues of $27,994,560 for Utility.com's electricity product line in fiscal year 2000. (Id. ¶ 40). During due diligence, defendants also allegedly provided plaintiffs with two press releases, one dated April 24, 2000 and the other dated May 17, 2000. (Id. ¶¶ 41(a), (b)). The earlier dated press release announced Utility.com's successful completion of $30 million in second round venture financing from leading investors. (Id. ¶ 41(a)). That press release quoted defendant King, who commented that the additional funding would allow Utility.com to continue to expand, and defendant Springer, who praised the company's "experienced management team, compelling value proposition and powerful brand identity" which made Utility.com "best positioned to become the nation's leading Internet utility provider." (Id. ¶ 41(a)). The press release dated May 17, 2000 announced that the company had enhanced its UtilityOne platform with software from several partners, including Portal and Vitria, and that the overhaul would enable "UtilityOne to support millions of customers" and to perform a series of "tasks necessary for effective, customer-friendly e-commerce...." (Id. ¶ 41(b)).

4. Post-Closing

In November of 2000, a few months after the closing of the merger, Utility.com raised approximately $22 million in a Series E financing. (Id. ¶¶ 8, 67-69). At that time, the Utility.com's bylaws required it to obtain plaintiffs' approval for the issuance of the shares for the Series E financing. (Id. ¶ 8). Utility.com originally sought and obtained plaintiffs' consent. (Id.). Subsequently, through its counsel, Utility.com provided plaintiffs a revised consent form and allegedly advised that plaintiffs did not have to sign the new version, because Utility.com could simply use plaintiffs' earlier-signed signature pages. (Id.). Utility.com allegedly represented that the later version

of the consent form did not contain material changes, but merely differed from the earlier version in that typographical errors were corrected.  (Id.).  In reality, according to plaintiffs, the later version contained material alterations to the purchase price and the structure of the transaction.  (Id.).

During the same month in which Utility.com obtained its Series E financing, November of 2000, it closed VCOM's New York office.  Approximately two and a half months later, on January 25, 2001, an administrator was installed to liquidate Utility.com's assets.  (Id. ¶ 9).  The liquidators commented that the failure of Utility.com could be attributed, at least in part, to poor management, a non-viable business model and inaccurate financial reporting.  (Id.).  The liquidators also ended up paying out certain sums to the State of Pennsylvania because Utility.com had guaranteed certain cost-of-power reductions to residents of that state. (Id. ¶ 73).  Plaintiffs expected that stockholders would receive nothing from the liquidation.  (Id. ¶ 9).

5. Contractual Releases Signed in Conjunction with the Merger Agreement

Section 9.5 of the Merger Agreement that Plaintiffs signed on June 30, 2000 included a merger clause that limited the scope of the parties' agreement.  It provided:

> Entire Agreement; Assignment. This Agreement, the Schedules and Exhibits hereto, and the documents and instruments and other agreements among the parties hereto referenced herein: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or remedies hereunder; and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided.

(MA at 62).

In addition to the merger clause contained in the Merger Agreement, plaintiffs also signed broadly worded releases in connection with the closing of the transaction.[4] Signing the releases was a precondition for the closing. (MA at 47).

## II. DISCUSSION

### A. The Standard

#### 1. Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)

When reviewing a motion to dismiss a complaint for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6), a district court may only dismiss plaintiffs' claims if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Drake v. Delta Air Lines, Inc., 147 F.3d 169, 171 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) (quotation marks omitted). A court must treat all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v. Bankers Trust Co., 166 F.3d 540 (2d Cir. 1999).

In considering this motion, the Court has reviewed the First Amended Complaint, as well as the documents referenced extensively therein, namely the Merger Agreement and the Information Statement. See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (internal citations omitted).

#### 2. Pleading Requirements of Fed. R. Civ. P. 9(b) and the PSLRA

---

[4] The August 25, 2000 releases state, in pertinent part:

> The undersigned . . . hereby releases and forever discharges [Utility.com] and [VCOM] and each of their respective individual, joint or mutual, past, present and future Representatives, affiliates, stockholders, controlling persons . . . from any and all claims, . . . whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which the undersigned, or any of his Representatives and Affiliates now has, have ever had or may hereafter have against the respective Releasees arising out of any matter, cause or event occurring contemporaneously with or prior to the Effective Time of the Merger . . . provided however, that nothing contained herein shall operate to release any obligations of [Utility.com] arising pursuant to the Agreement.

(Releases executed by Steven Dresner and Robert Stark, dated August 25, 2000).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Although that rule requires that "[a]ny fraud must be pled with particularity," it "is applied assiduously to securities fraud." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 168 (2d Cir. 2005). The U.S. Court of Appeals for the Second Circuit interprets Rule 9(b) to require that "[t]he complaint … identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001).

With respect to securities fraud allegations, the heightened pleading requirements of Fed. R. of Civ. P. 9(b) "were (essentially) codified in the Private Securities Litigation Reform Act of 1995 [("the PSLRA")]," 15 U.S.C. § 78u-4. Lentell, 396 F.3d at 168; see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). The PSLRA mandated a uniform national pleading standard for securities fraud actions that mimics the standard the Second Circuit had derived from Rule 9(b), except insofar as the PSLRA requires particularity in the pleading of the requisite mental state.[5] See Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000). Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA. See 15 U.S.C. § 78u-4(b)(3)(A); see also Novak, 216 F.3d at 307.

---

[5] The PSLRA provides in relevant part that:
> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only upon proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). The statute further provides that,
> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant –
> made an untrue statement of a material fact;
> or
> … omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1).

<u>B. Plaintiffs' Claims</u>

Plaintiffs have brought five claims: (1) fraudulent inducement against Utility.com and the Individual defendants; (2) violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder against Utility.com and the Individual Defendants; (3) violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 77o, against Primedia, the idealab! Defendants and the Individual Defendants; (4) negligent misrepresentation against Utility.com and the Individual Defendants; and (5) common law fraud against Utility.com and the Individual Defendants. This analysis begins with the causes of action brought pursuant to federal securities law.

<u>C. Section 29 Prohibits Broad Releases of Non-Matured Claims</u>

Defendants contend that they are insulated from liability by virtue of the sweeping release that each plaintiff signed in connection with the merger closing. Plaintiffs maintain that the releases are not legally enforceable waivers of securities fraud claims. Indeed, "[i]t is well settled that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct." <u>Turkish v. Kasenetz</u>, 27 F.3d 23, 27-28 (2d Cir. 1994). In particular, Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), invalidates releases that attempt to insulate beneficiaries from the compliance with the Exchange Act.[6]

Courts have held that Section 29(a) does not prohibit parties from executing valid releases in connection with securities fraud claims that have already matured. <u>See</u> <u>Korn v. Franchard Corp.</u>, 388 F. Supp. 1326, 1328 (S.D.N.Y. 1975); <u>Mittendorf v. J.R. Williston & Beane Inc.</u>, 372 F. Supp. 821, 834 (S.D.N.Y. 1974). That interpretation enables parties to reach binding settlements to resolve

---

[6] That section provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or any rule of an exchange required thereby shall be void." 15 U.S. C. § 78cc(a).

existing securities fraud disputes. The releases at issue here did not constitute a settlement of an existing dispute, but rather purported prospectively to waive plaintiffs' rights to pursue causes of action of which they were not yet aware. Cf. Lancer Offshore, Inc. v. Dominion Income Mgmt. Corp., No. 01 Civ. 4860, 2002 WL 441309, at *6 (S.D.N.Y. Mar. 20, 2002) (enforcing a release against an Exchange Act claim when the release had been negotiated in response to a threat to sue). Section 29(a) forbids enforcement of that type of contract to bar Exchange Act claims. See Seymour v. Bache & Co., Inc., No 75 Civ. 3722, 1976 WL 751, at *3 (S.D.N.Y. Jan. 14, 1976); Korn, 388 F.Supp. at 1328. Therefore, the August 25, 2000 releases do not preclude plaintiffs' claims.

## D. Securities Fraud in Violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

As the releases do not bar this action, the Court turns to the defendants' contentions that the First Amended Complaint fails to state a claim for violation of Sections 10(b) and 20(a) of the Exchange Act. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. § 78j(b). One such rule, Rule 10b-5, prohibits "mak[ing] an untrue statement of material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading…." 17 C.F.R. § 240.10b-5. To state a claim pursuant to these provisions, plaintiffs must plead "that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.2003) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000)).

Plaintiffs have also alleged that the Individual Defendants, the idealab! Defendants and Primedia are subject to "controlling-person liability" pursuant to Section 20(a) of the Exchange Act, 15

U.S.C. § 77o.[7]  (FAC ¶¶ 87-90).  To allege a proper claim for controlling-person liability, plaintiffs must allege inter alia an underlying securities law violation by the controlled person.  See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998); Marcus v. Frome, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003).  Thus, the Court's analysis begins with plaintiffs' claim pursuant to Section 10(b).

Plaintiffs allege misstatements and omissions occurring: 1) in advance of the Merger Agreement; 2) in the Merger Documents and during the period of due diligence; and 3) after the closing of the transaction.  The alleged misstatements and omissions are addressed below in these chronological categories.

1. Statements or Omissions In Advance of the Merger Agreement

Plaintiffs may not maintain a securities fraud claim unless they allege that they reasonably relied on a misrepresentation or omission.  Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).  Plaintiffs have alleged that they relied, at least in part, on several statements that defendants made in advance of the signing of the Merger Agreement.  The Merger Agreement purported to "constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof[.]"  (MA at 62).  That term of the Merger Agreement – the merger clause – in combination with other provisions of the Merger Documents and the facts alleged in the First Amended Complaint, render plaintiffs' reliance on statements made before

_____

[7] 15 U.S.C. § 77o, Liability of Controlling Persons, provides:
Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 [15 USCS § 77k or 77 l], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

the signing of the Merger Agreement unreasonable as a matter of law. [8]  See Emergent Capital, 343

F.3d at 195; Harsco Corp. v. Segui, 91 F.3d 337, 343 (2d Cir. 1996).

Plaintiffs maintain that Section 29(a) of Exchange Act, 15 U.S.C. § 77cc(a), precludes

enforcement of any waiver of Exchange Act claims, and that the merger clause is therefore invalid.

The merger clause is not, however, like the releases discussed above.  It is not a waiver of claims, but

rather a limited wavier of reliance on certain representations.  In Harsco Corp. v. Segui, the U.S. Court

of Appeals for the Second Circuit held that Section 29(a) did not proscribe enforcement of a merger

clause negotiated between sophisticated parties as part of a comprehensive agreement.  91 F.3d at 343.

The Harsco Court distinguished Rogen v. Ilikon Corp., 361 F.2d 260 (1st Cir.1966) – in which the U.S.

Court of Appeals for the First Circuit held that a non-reliance provision contravened Section 29(a) and

was therefore invalid – on the ground that the parties in Rogen had disparate levels of sophistication.

Harsco, 91 F.3d at 344-45.  The Harsco Court concluded that "there is nothing in the complaint or the

Agreement that indicates that Harsco was duped into waiving the protections of the securities laws."

Id. at 344.  The Second Circuit has continued to hold that in appropriate circumstances, sophisticated

parties may waive rights to rely on statements made outside an agreement, thereby precluding

themselves from alleging fraud on the basis of those statements.  See Emergent Capital, 343 F.3d at

196; see also Consolidated Edison, Inc. v. Northeast Utilities, 249 F. Supp. 2d 387, 402 (S.D.N.Y. Mar

21, 2003).  To determine whether plaintiffs' reliance was reasonable in light of the merger clause, the

Court must look to "the entire context of the transaction, including factors such as its complexity and

---

[8] The merger clause in ¶ 9.5 of the Merger Agreement provided:
  Entire Agreement; Assignment. This Agreement, the Schedules and Exhibits hereto, and the
  documents and instruments and other agreements among the parties hereto referenced herein: (a)
  constitute the entire agreement among the parties with respect to the subject matter hereof and
  supersede all prior agreements and understandings, both written and oral, among the parties with
  respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or
  remedies hereunder; and (c) shall not be assigned by operation of law or otherwise except as
  otherwise specifically provided.

magnitude, the sophistication of the parties and the content of any agreements between them."

<u>Emergent Capital</u>, 343 F.3d at 195.

The parties to this litigation are sophisticated business people who were advised by sophisticated counsel during the extensive negotiations that led to the merger and the period of confirmatory due diligence.  (<u>See</u> IS at 22, 52; MA ¶ 8.1(b)).  Plaintiffs benefited from a series of warranties and representations that Utility.com made in the Merger Agreement.  (<u>See</u> MA at 30-37).  Those included detailed representations related to Utility.com's organizational and capital structure; Utility.com's authority to enter into the transaction, its adherence to the law and its insurance coverage; the integrity and completeness of Utility.com's financial statements, liability disclosures and minute books; Utility.com's valid and alienable leasehold and intellectual property rights; and Utility.com's lack of affiliates, material financial changes since the then-relevant balance sheet, pending litigation, insider transactions and broker's fees outstanding from the merger transaction. (<u>See</u> <u>id.</u>).

In light of the clear language of the merger clause, the sophistication of the parties, the relative parity of bargaining power, the litany of representations and warranties contained in the Merger Agreement, as well as the cautionary language in the Information Statement that qualified any pre-Merger Agreement statements, plaintiffs have failed to proffer facts suggesting it would have been reasonable for them to rely on representations made in advance of the Merger Agreement.  In <u>Harsco</u>, the Second Circuit held that the plaintiff's reliance was unreasonable because:

> Here there is a detailed writing developed via negotiations among sophisticated business entities and their advisors. That writing, we conclude, defines the boundaries of the transaction. Harsco brings this suit principally alleging conduct that falls outside those boundaries.

91 F. 3d at 343.  Similarly in the instant action, plaintiffs negotiated a comprehensive Merger Agreement with defined boundaries.  Insofar as plaintiffs claim they were defrauded by representations

made before the signing of the Merger Agreement, they are "alleging conduct that falls outside those boundaries" and they cannot establish the reasonableness of their reliance. Id.

Therefore, plaintiffs' Section 10(b) claim is dismissed insofar as it relates to representations that occurred before the signing of the Merger Agreement.

2. Statements or Omissions in the Merger Documents and During Due Diligence

As noted above, to state a claim pursuant to Section 10(b), "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.2003) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000)). Fed. R. Civ. P. 9(b) and the PSLRA impose particularity requirements on Section 10(b) complaints, mandating that they "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (citations and internal quotation marks omitted). Plaintiffs have satisfied the first and third of these requirements with respect to statements that defendants allegedly made during due diligence and in the merger documents. The First Amended Complaint identifies which statements were allegedly misleading and the particular documents that contained them. See In re Globalstar Sec. Litig., No. 01 Civ. 1748, 2003 WL 2295163, at * 5 (S.D.N.Y. Dec. 15, 2003). Plaintiffs have failed, however, to satisfy the second and fourth requirements.

a. Identification of the Speaker

The second particularity requirement imposes on plaintiffs an obligation to identify the speaker of any allegedly misleading statement. Plaintiffs vaguely charge statements made during due diligence and in the Merger Documents against all defendants. A number of courts have recognized that such

indiscriminate defendant "clumping" does not adhere to the particularity standards of Fed. R. Civ. P. 9(b) and the PSLRA. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) ("[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complaint of by each defendant. A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)."); Leemon v. Burns, 175 F. Supp. 2d 551, 556 (S.D.N.Y. 2001) ("[A] complaint alleging fraud against multiple defendants must state the allegations specifically attributable to each individual defendant."); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 225, 237 (S.D.N.Y. 2000) ("The Complaint does not differentiate in any way between defendants, nor does it attempt to link any of the defendants with the alleged fraudulent statements.").

Plaintiffs claim that they may rely on the group pleading doctrine and attribute the statements made during due diligence and in the Merger Documents to all defendants. Group pleading is an exception to the requirement that plaintiffs must identify the speaker of an allegedly fraudulent statement with particularity. It permits plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (internal quotation marks omitted); see also Polar Int'l Brokerage Corp., 108 F. Supp. 2d at 237. Nevertheless, the group pleading doctrine is "extremely limited in scope[,]" applying "only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." Polar Int'l Brokerage Corp., 108 F. Supp. 2d at 237.

The Non Insider Defendants are not presumed to have participated in the preparation of corporate publications. See Schnall v. Annuity and Life Re (Holdings), Ltd., 3:02 Civ. 2133, 2004 U.S. Dist. LEXIS 1601, at *11 (D. Conn. Feb. 4, 2004) ("[O]utside directors, although almost by definition excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their statues or a special relationship with the corporation, they have access to information more akin to a corporate insider."). Plaintiffs offer no specific allegations that suggest that the Non Insider Defendants took part in the preparation of the Merger Documents or due diligence disclosures, nor that they acted like corporate insiders. Cf. Sperber Adams Assocs. v. JEM Mgmt. Assocs. Corp., 90 Civ. 7405, 1992 U.S. Dist. LEXIS 93101, at *5 (S.D.N.Y. June 4, 1992) (outside director who prepared and disseminated offering materials may be considered an insider for Fed. R. Civ. P. 9(b) particularity purposes). Instead, plaintiffs rely on conclusory, vague allegations that the Insider Defendants exercised control over Utility.com.[9] Plaintiffs' conclusory allegations are insufficient to satisfy the requirements of Fed. R. Civ. P. 9(b) and the PSLRA. Consequently, plaintiffs may not invoke the group pleading doctrine against the Non Insider Defendants. See In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 768 (S.D.N.Y. 2001); Polar Int'l Brokerage Corp, 108 F. Supp. 2d at 237-38. Plaintiffs have failed to plead properly that the Non Insider Defendants participated in making alleged misstatements and omissions during due diligence or in the Merger Documents.

> b. Why the Statements Were Allegedly Fraudulent

Plaintiffs may make use of the group pleading doctrine with respect to the Insider Defendants, who by virtue of their positions as executives of Utility.com can be presumed to have had active daily

---

[9] Plaintiffs also claim that defendants Gross was a co-founder of Utility.com. (FAC ¶ 17(a)). That fact, even in combination with the conclusory allegation that he "continued to exercise considerable control over [Utility.com] at all times relevant to the allegations raised herein[,]" does not render him an insider for purposes of the group pleading doctrine.

roles in the company. Nevertheless, the group pleading doctrine does not save plaintiffs' claims against the Insider Defendants, because plaintiffs have failed to satisfy the fourth particularity requirement – indicating why the statements were fraudulent. Plaintiffs have failed to convey through specific factual allegations that the defendants made statements or omissions that were contemporaneously misleading. See In re Globalstar Sec. Litig., 2003 WL 2295163, at * 5; In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001) (citing San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 812-13 (2d Cir. 1996)).

To satisfy their pleading obligations, "plaintiffs must do more than say that … statements… were false and misleading, they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004). The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). According to the Second Circuit, that PSLRA provision requires that "where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).

The Merger Agreement allegedly misrepresented material facts in reporting that Utility.com had no significant undisclosed liabilities, had not made any capital expenditure greater than $10,000 since the date a balance sheet was issued to plaintiffs and did not expect any material adverse effects as defined therein. (FAC ¶ 44). In addition, section 3.16 of the Merger Agreement represented that "none of the representations or warranties made by [Utility.com] … contains or will contain … any

untrue statement of a material fact, or intentionally omits or intentionally will omit … any material fact

… in order to make the statements contained herein or therein, in light of the circumstances under

which made, not misleading….” (Id. ¶ 46).   Plaintiffs contend that the Information Statement, which

was provided to VCOM shareholders in connection with the merger, was materially misleading,

because it described Utility.com's financial circumstances in positive terms (id. ¶ 48), it highlighted

the company's intention to expand its business (id. ¶¶ 49, 51, 53), it represented that the company

offered “superior customer service” (id. ¶ 50) and it listed the company's “financial sponsors” (id. ¶

51).  Plaintiffs contend that the Merger Agreement and the incorporated Information Statement failed

to disclose problems with Utility.com's business plan, UtilityOne software, customer service and

collection of receivables; a contingent liability resulting from an agreement to provide discounted

electrical power to residents of Pennsylvania; the intention to close VCOM's New York office; and the

existence of a major capital expenditure of $4,075,000 for advertisements.

 During due diligence, Utility.com allegedly made misrepresentations and omissions in its

business plan, financial projections and two press releases that were provided to plaintiffs.  These

documents allegedly contained unrealistically rosy projections for Utility.com's financial future and

misleading praise for UtilityOne software's capabilities.[10]

 Defendants contend that the “bespeaks caution” and “safe harbor” doctrines should protect

many of their statements as immaterial, forward-looking prognostications.  However, plaintiffs have

not alleged misrepresentations in the form of faulty predictions.  Rather, plaintiffs allege that

defendants' representations were false statements of contemporary or historical circumstances to which

---

[10] Plaintiffs do not ascribe dates to the alleged misrepresentations that occurred during due diligence.  Because due diligence began after the execution of the term sheet on May 30, 2000 and presumably continued until the closing on August 25, 2000, these representations may have occurred before or after the signing of the Merger Agreement on June 30, 2000.  The Court has determined that as a matter of law, plaintiffs may not have reasonably relied on any representations made prior to the Merger Agreement, because of the merger clause contained therein.  Therefore, in drawing all reasonable inferences in plaintiffs' favor, the Court has presumed that the misrepresentations alleged to have occurred during due diligence all occurred following the Merger Agreement.

these doctrines do not apply.  See In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 316, 340 (S.D.N.Y. 2000); In re AMF Bowling Sec. Litig., No. 99 Civ. 3023, 2001 U.S. Dist. LEXIS 3182, at *16 (S.D.N.Y. Mar. 22, 2001).  The Court will therefore analyze the alleged misstatements and omissions to determine whether they constitute misleading representations of then-existing facts.  Those alleged misstatements and omissions are addressed seriatim below in the following topical categories: the financial condition of Utility.com, the Imagitas expenditure, alleged software and customer service problems, closing of the VCOM office, the Pennsylvania liability and uncollectible accounts.

### i. Financial Condition

Plaintiffs allege several material omissions or misstatements relating to the state of Utility.com's business at the time of the merger.  Plaintiffs specifically charge that the defendants failed to convey accurately the failure of Utility.com's business plan, the company's excessive expenditures to secure clients and its lack of a skilled management team.  Plaintiffs further contend that the due diligence disclosures contained unrealistic characterizations of Utility.com's business and its likely prospects.

Plaintiffs have not pled with proper particularity that the financial characterization of Utility.com contained in the Merger Documents and due diligence disclosures was materially misleading when produced.  Fraud cannot be pled by hindsight and plaintiffs have not alleged facts indicating that the statements were false at the time they were made.  See In re: Carter Wallace Sec. Litig., 220 F.3d 36, 42 (2d Cir. 2000); Novak, 216 F.3d at 309; Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999).

Plaintiffs have failed to allege properly that the statements relating to Utility.com's financial condition were contemporaneously false.  Although plaintiffs need not allege "the exact date and time" when defendants became aware of information contrary to their statements, they must "supply some

factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir. 2000) (quotation marks and citation omitted). Retrospective frustration at the failure to meet the projections spelled out in the Information Statement does not support a cause of action for securities fraud. See In re: Carter Wallace Sec. Litig., 220 F.3d at 42. That this high-risk dot com company failed within approximately seven months of the merger does not supply an adequate basis to conclude that the representations in the relevant disclosures were false.

There are no particular allegations in the First Amended Complaint that demonstrate that at the time of the preparation of the Merger Documents, Utility.com's management team was indeed unskilled or that the Utility.com's business plan had already failed. The Information Statement explicitly cautioned plaintiffs that Utility.com was risky, currently unprofitable, and likely not to earn a profit in the foreseeable future. (See IS at 5, 9-11, 37-39). The Information Statement warned that the effectiveness of Utility.com's business plan had yet to be determined and the company's success depended on a series of variables, such as ability to retain customers and develop effective technology. (Id. at 10-11). Moreover, the Information Statement included extensive warnings regarding the potential variance from projected earnings and the potential inability of Utility.com to manage growth effectively. (Id. at 11-12; 14-15). That document also cautioned that success of the merger depended on retaining key managers, none of whom were obligated to stay with the company. (See Id. at 9). Plaintiffs have failed to allege with particularity that the eventualities of which they were warned had already occurred by the time the Merger Documents were signed.

Plaintiffs' allegations relating to the state of Utility.com's business are insufficiently particular to demonstrate that any defendants misrepresented or omitted a material fact. See Rombach, 355 F.3d at 172 (requiring plaintiffs to "state with particularity the specific facts in support of [plaintiffs'] belief

that [defendants'] statements were false when made" to satisfy Rule 9(b) and the PSLRA) (bracketed text in <u>Rombach</u>); 15 U.S.C. § 78u-4(b)(1).

### ii. Imagitas Expenditure

Plaintiffs allege that the Merger Agreement failed to disclose a $4.075 million payment to Imagitas for advertisements, even though it purported to disclose all significant capital expenditures over $10,000 since the date of Utility.com's then-relevant balance sheet. (FAC ¶ 44, 45(g)). Assuming <u>arguendo</u> that plaintiffs are correct that advertising outlays should be listed among capital expenditures, the Court still has found no allegations in the First Amended Complaint as to when this alleged expenditure was made. If the $4.075 million were not spent after the issuance of Utility.com's then-existing balance sheet, the representation in the Information Statement would appear not to be misleading. Moreover, plaintiffs do not specifically allege that the $4.075 million was not counted in the $10.2 million that Utility.com disclosed it had spent on advertising and marketing during the six months leading up to June 30, 2000. (<u>See</u> IS at 38).

Plaintiffs have not established with sufficiently particular allegations that any defendant misrepresented or omitted a material fact in relation to Utility.com's expenditure of $4.075 million for advertising. <u>See</u> <u>Rombach</u>, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

### iii. Alleged Software and Customer Service Problems

Plaintiffs contend that in the Merger Documents and during due diligence, defendants misrepresented the functionality of UtilityOne, the software that constituted the technological foundation of Utility.com. Among several laudatory representations regarding UtilityOne, the Information Statement provided that the software was "scalable to 25 million customers." (<u>Id.</u> ¶¶ 55-57). Plaintiffs have failed to allege with the requisite particularity that the representations regarding UtilityOne were materially misleading when made.

Plaintiffs contend that the "core" of UtilityOne, its "2.0 Billing Engine[,]" "was virtually inoperable at all times it was in use." (FAC ¶ 27). To substantiate that claim, plaintiffs point to a November 3, 1999 memorandum sent to Michael Anderson indicating that the 2.0 Billing Engine was non-functioning. In addition, plaintiffs allege that "according to a former employee of Utility.com, who was employed at the Company until January 2000, the 2.0 Billing Engine was not functional as of January 2000 and the Company could not process customers from San Diego, California and, as a result, were not billing customers from San Diego." (Id. ¶ 28). The memorandum and comment of the employee do not shed light on the state of Utility.com's software at the time of the merger, because, at some point "[s]hortly after January 2000," Utility.com switched to a different billing engine driven by software from Portal and Vitria (the "Portal System"). (Id. ¶¶ 28; 41(b)). Plaintiffs proffer allegations relevant to problems Utility.com allegedly had with the Portal System. (FAC ¶ 29). These allegations are deficient because they lack a temporal nexus to the transaction at issue. Plaintiffs never allege with particularity that the specific problems with UtilityOne were occurring at the time of the preparation of the Merger Documents or any point thereafter. The only temporal reference that potentially implicates the functionality of the software at the time of the Merger Documents is the alleged statement by an unnamed employee that "the UtilityOne platform 'never worked.'" (FAC ¶ 29).[11] This allegation does not satisfy the particularity requirement that Rule 9(b) and the PSLRA impose with respect to allegations of material falsity. Plaintiffs have not demonstrated with particularized allegations why the statements in the Merger Documents praising UtilityOne were contemporaneously misleading.

The Information Statement included a warning that "Utility.com's success depends upon the proper operation of internally developed software systems as well as third-party products." (Id. ¶ 65).

---

[11] Plaintiffs also allege that the software was liquidated for a low price. $350,000 plus royalties was offered by one entity, but another ended up paying an undisclosed sum. (FAC ¶ 74). Plaintiffs argue that this supports the conclusion that the software was "marginally functional." (Id.). However, the offer of $350,000 undercuts plaintiffs' contention that the software was inoperable.

It went on to caution that "[t]his software may contain undetected errors, defects or bugs" and that "[a]lthough Utility.com has not suffered significant harm from any errors or defects to date, Utility.com may discover significant errors or defects in the future that it may or may not be able to correct." (Id.). Plaintiffs have failed to allege with the requisite particularity that these statements were false at the time of the Merger Documents. It is not clear from the allegations in the First Amended Complaint that Utility.com had suffered "significant harm" from glitches in the Portal System.

Plaintiffs have failed to meet their particularity burden in alleging that defendants' statements relating to UtilityOne were false when made. See Rombach, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

Plaintiffs contend that Utility.com's positive representations regarding its "superior customer service" operation were misleading, because, according to a former Utiltiy.com employee, the company's technical problems led "thousands of customers" to email complaints which went unanswered "for months." (Id. ¶¶ 30, 50). However, plaintiffs never convey allegations indicating when this problem occurred. They acknowledge that Utility.com remedied the problem, and enlisted "all employees [to] help respond to the emails to eliminate the backlog." (Id.). The First Amended Complaint does not specifically allege that Utility.com had any problems with customer service at the time of the merger. Plaintiffs do not properly allege that the failure to disclose the alleged historical customer service snarl was materially misleading at the time the Merger Documents were prepared. To the extent such customer service problems might recur, the Information Statement specifically warned that "inconsistent quality of service could impact the level of demand or acceptance of internet services." (IS at 11, 15).

Plaintiffs have failed to meet their particularity burden in alleging defendants' statements relating to its customer service operation were misleading when made. See Rombach, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

## iv. Closing the VCOM Office

The Information Statement was misleading, according to plaintiffs, because it did not disclose that defendants intended to close VCOM's office in New York. (FAC ¶ 59). The Information Statement explicitly warned that "[t]he difficulty of the integration [of VCOM and Utility.com] may be increased by the geographical separation of the two companies and their employees. For example, Utility.com may not be able to retain key executives and employees of VCOM after the merger." (IS at 7-8). This cautionary statement put plaintiffs on notice of the possibility that the VCOM office could be closed. Plaintiffs maintain that because the decision to close VCOM's office had already been made, the disclosures in the Information Statement were false. (Id. ¶ 59). Plaintiffs never allege with any particularity, however, that the decision to close the New York office of VCOM had been made before the merger.

Plaintiffs fail to allege with particularity that the representations in the Information Statement regarding the closure of the VCOM office were misleading when made. See Rombach, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

## v. Pennsylvania Liability

Plaintiffs contend that Utility.com violated GAAP by not disclosing a contingent liability stemming from the company's pledge to provide Pennsylvania residents discounted power. (FAC ¶¶ 61-64). Plaintiffs fail to allege with the requisite particularity, however, that the pledge constituted a liability at the time the Merger Documents were prepared. There are no particularized allegations suggesting that these obligations had become a liability that should have been disclosed. In any event, the Information Statement disclosed that Utility.com had offered rebates for new customers in the past

and was currently offering a 20% discount to all of its customers on electric service. (See IS at 36). The discount guaranteed to the Pennsylvania residents was 20%, the same amount disclosed in the Information Statement. (FAC ¶ 73).

Plaintiffs have failed to plead with particularity that Utility.com's financial statements were misleading for failing to disclose its agreement to provide discounted power to residents of Pennsylvania. See Rombach, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

### vi. Uncollectible Accounts

The First Amended Complaint alleges that a former employee who had been a technical project manager claimed that the company had approximately $2 million in uncollectible accounts. (FAC ¶ 30). At other points in the FAC, plaintiffs claim that the amount of uncollected receivables was $1 million. (Id. ¶¶ 10, 45(c)). These allegations are contradictory and therefore not properly particular. Plaintiffs provide no specific allegations regarding what accounts or types of accounts were allegedly delinquent. The lack of particularity is underscored by the fact that at the time of the Merger Agreement, the total amount that Utility.com represented as its accounts receivable was approximately $119,000 and its total revenue since its inception was $1.03 million. (IS at 37; FAC ¶ 60). Plaintiffs fail to explain how the uncollectible accounts figure would have been so much greater than the company's total accounts receivable and its total historical revenue, other than to claim vaguely that billing problems led to Utility.com's inability to ascertain the amount of uncollectibles. (FAC ¶¶ 10, 60). That allegation does not cure the deficiency of particularity in these allegations. Neither does the claim that one unnamed employee said that the company had a "high number of uncollectible accounts" and another unnamed employee said "there was a huge percentage of uncollectible accounts, approximately $2 million, and the Company could not get a handle on the extent of the problem." (Id. ¶ 30).

The Information Statement explicitly admonished that "Utility.com's failure to implement adequate collection programs could materially affect Utility.com's business, results of operations and financial condition." (Id. ¶ 66). The allegations in the First Amended Complaint are not sufficiently specific to give rise to the inference that such collection problems had already occurred and that the warning was therefore misleading. See Rombach, 355 F.3d at 172; 15 U.S.C. § 78u-4(b)(1).

Plaintiffs have failed to allege with particularity that the Merger Documents or due diligence disclosures contained materially misleading statements or omissions. As plaintiffs have failed to allege such falsity properly, the Court must dismiss plaintiffs' Section 10(b) claim to the extent it relates to alleged misrepresentations and omissions made in the Merger Documents and due diligence disclosures.

### 3. Statements or Omissions After the Merger

Plaintiffs contend that following the merger they were misled into consenting to the issuance of Series E preferred shares. (FAC ¶ 69). Plaintiffs have failed to allege that this misrepresentation caused them any specific harm. See Dura Pharms., Inc. v. Broudo, --- U.S. ----, 125 S. Ct. 1627, --- L. Ed. 2d. ---- (2005). The Second Circuit requires securities fraud plaintiffs to allege both transaction and loss causation. See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005). "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Id. (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)). Plaintiffs have properly alleged transaction causation by claiming that defendants deceived them into inadvertently approving the transaction. (FAC ¶ 69).

Loss causation is akin to proximate cause in tort law and "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell, 396 F.3d at 172. The

PSLRA has codified the loss causation requirement. See id. (noting that 15 U.S.C. § 78u-4(b)(4), which mandates that plaintiffs allege that a violation of the Exchange Act "caused the loss" codifies the loss causation requirement). "[P]leading principles … require both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk[.]" Id.; Emergent Captial, 343 F.3d at 197; see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001). "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." Lentell, 396 F.3d at 174 (quoting Emergent Capital, 343 F.3d at 199 (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001))) (quotation marks omitted). The loss causation requirement imposes a limit on a person's responsibility, even for wrongful conduct. Id.

Plaintiffs have not sufficiently alleged loss causation with respect to the Series E financing. The First Amended Complaint contains no indication as to what loss was occasioned by procurement of the Series E financing. The merger had already occurred and plaintiffs have not claimed that the subsequent infusion of capital into the business caused any additional injury. See Lentell, 396 F.3d at 176-77. Therefore, plaintiffs' Section 10(b) claim is dismissed insofar as it pertains to the representations relating to post-merger Series E financing.

4. Dismissal of the Claims Pursuant to Sections 10(b) and 20(a)

With respect to the pre-merger statements, plaintiffs have failed to plead reasonable reliance, because of the existence of a valid, enforceable merger clause. In regard to the statements in the Merger Documents and due diligence disclosures, plaintiffs do not proffer the requisite, particular allegations to show the Non Insider Defendants' roles in the preparation of those documents. Moreover, plaintiffs do not properly allege that those documents contained statements that were materially misleading when made. In regard to the post-merger inducement to consent to the Series E

financing, plaintiffs have alleged no additional loss.  In sum, plaintiffs have not properly pled their Section 10(b) claim with particularity.  The Court need not address whether any defendant acted with scienter, because plaintiffs have failed to establish other essential elements of their Section 10(b) claim.

Plaintiffs' failure to state a claim for underlying liability eviscerates their controlling-person liability claim pursuant to Section 20.  See Marcus v. Frome, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003) ("To make out a prima facie case under Section 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.") (quoting S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) (quotations and internal alterations omitted)); see also Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).  As a result of plaintiffs' failure to state a claim pursuant to Section 10(b), their claim pursuant to Section 20(a) of the Exchange Act is dismissed.

E. State Law Claims

In addition to their claims pursuant to federal securities laws, plaintiffs bring three claims pursuant to state law, namely fraudulent inducement, negligent misrepresentation and fraud.  Given that the Court has dismissed all federal claims, it will not entertain plaintiffs' remaining state law claims, which are apparently brought pursuant to this Court's supplemental jurisdiction.  See 28 U.S.C. § 1367(c); Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004).  Therefore, those claims are dismissed.

III. Conclusion

Plaintiffs have failed to comply with the directives of Fed. R. Civ. P. 9(b) and the PSLRA in setting forth the alleged facts that underlie their Sections 10(b) and 20(a) claims.  Those claims must be

dismissed, and the Court declines to exercise its supplemental jurisdiction over the remaining state law claims. Therefore, defendants' motions to dismiss plaintiffs' First Amended Complaint are granted.

Plaintiffs' request for leave to amend their complaint is granted. Should plaintiffs choose to submit a second amended complaint, they shall file it on or before June 24, 2005.

Dated: New York, New York
       May 18, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.